UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROSEMARY A. LIGOTTI,

                                        Plaintiff,

                v.

PROVIDENT LIFE AND CASUALTY
  INSURANCE COMPANY, and
THE UNUM GROUP,

                                        Defendants.

_____

|  |  |
|---|---|
| | **REPORT**<br>**and**<br>**RECOMMENDATION** |
| | **10-CV-00564A(F)** |

APPEARANCES:            STAMM LAW FIRM
                        Attorneys for Plaintiff
                        GREGORY STAMM, of Counsel
                        1127 Wehrle Drive
                        Suite 100
                        Williamsville, New York 14221

                        PHILLIPS LYTLE LLP
                        Attorneys for Defendants
                        PAUL K. STECKER, of Counsel
                        3400 HSBC Center
                        Buffalo, New York 14203

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on

July 29, 2010, for all pretrial matters.  The action is presently before the court on

Plaintiff's motion for summary judgment (Doc. No. 70), filed April 30, 2012.

## BACKGROUND

On June 18, 2010, Plaintiff Rosemary A. Ligotti ("Plaintiff" or "Ligotti"),

commenced this action in New York Supreme Court, Erie County, alleging Defendant

Provident Life and Casualty Insurance Company ("Provident" or "Defendant")) and The Unum Group ("Unum"),[1] have wrongly denied Plaintiff's claim for payment of disability benefits in accordance with an insurance policy issued by Provident. Plaintiff asserts four grounds for relief on which she seeks to recover including claims for (1) declaratory relief ("First Claim"); (2) breach of contract ("Second Claim"); (3) bad faith and attorney's fees ("Third Claim"); and (4) attorney's fees on the breach of contract claim ("Fourth Claim"). On July 7, 2010, Defendant removed the action asserting diversity of citizenship as the basis for jurisdiction in this court. Defendant filed an answer on July 27, 2010 (Doc. No. 6).

On April 30, 2012, Plaintiff filed the instant motion for summary judgment (Doc. No. 70) ("Plaintiff's motion"), supported by the attached Statement of Undisputed Material Facts Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure (Doc. No. 70-1) ("Plaintiff's Statement of Undisputed Facts"), the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Doc. No. 70-2) ("Plaintiff's Memorandum"), and exhibits 1 through 30 (Docs. Nos. 70-3 through 70-32) ("Plaintiff's Exh(s). __"). On June 8, 2012, Defendant filed the Declaration of Paul K. Stecker, Esq. in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 72) ("Stecker Declaration"), with attached exhibits 1 through 24 (Docs. Nos. 72-1 through 72-24), 25 through 30 (Docs. Nos. 73-1 through 73-6), and 31 through 37 (Docs. Nos. 74-1 through 74-7) ("Defendant's Exh(s). __"), the Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 75) ("Defendant's Statement of Facts"), and the Memorandum in

---

[1] Although named as a Defendant, partial summary judgment dismissing the claims against Unum was granted on December 16, 2011 (Doc. No. 61), such that Provident remains as the only Defendant.

Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 76) ("Defendant's Response"). On June 21, 2012, Plaintiff filed the Reply Memorandum to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 78) ("Plaintiff's Reply"), and the Reply Declaration of Paul K. Stecker, Esq. In Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 79) ("Stecker Reply"), with attached exhibits 1 through 5 (Docs. Nos. 79-1 through 79-5) ("Plaintiff's Reply Exh(s). __"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be DENIED.


**FACTS**[2]

Since December 27, 1984, Plaintiff Rosemary A. Ligotti ("Plaintiff" or "Ligotti"), has maintained a disability income insurance policy ("Insurance Policy")[3] issued by Defendant Provident Life and Casualty Insurance Company ("Provident" or "Defendant"), a wholly-owned subsidiary of The Unum Group ("Unum"). The Insurance Policy provides for payment of benefits to Plaintiff upon suffering an injury or illness rendering Plaintiff totally disabled as defined under the Insurance Policy.

The parties do not dispute that Plaintiff has long suffered from chronic dry eye

---

[2] Taken from the pleadings and motion papers filed in this action.

[3] Copies of the Insurance Policy are filed as an exhibit to the Complaint (Doc. No. 1-1), and Plaintiff's Exh. 1 (Doc. No. 70-3).

conditions including Sjögren's Syndrome,[4] and Filamentary Keratitis,[5] which result in decreased tear production, making it difficult to keep the corneas of one's eyes lubricated, causing discomfort, pain, and a constant sensation that something gritty or sandy is in the eyes, resulting in distorted and blurred vision. In a severe case of chronic dry eyes, the patient may be unable to participate in activities requiring use of the eyes for an extended period of time, particularly activities such as reading, viewing a computer monitor, and driving, which can result in a decreased rate of blinking thereby further reducing eye lubrication and increasing eye discomfort and diminished vision. Plaintiff's Sjögren's Syndrome was initially diagnosed, with confirmation by biopsy performed by an eye specialist in Boston, Massachusetts on February 1, 1984, Defendant's Exh. 36, and since then Plaintiff has received medical treatment for her chronic dry eye condition from ophthalmologists Claude M. Fichte, M.D. ("Dr. Fichte"), and Michael J. Endl, M.D. ("Dr. Endl").

Despite its confirmation by biopsy 10 months earlier on February 1, 1984, Plaintiff did not disclose on the Application for Disability Insurance ("Insurance Policy Application"),[6] completed on December 14, 1984, that she suffered from Sjögren's

---

[4] Sjögren's Syndrome is "a chronic inflammatory autoimmune disease that affects especially older women, that is characterized by dryness of the mucous membranes especially of the eyes and mouth and by infiltration of the affected tissues by lymphocytes, and that is often associated with rheumatoid arthritis – called also *sicca syndrome* . . . ." Medical Dictionary, http://www.merriam-webster.com/medlineplus/sjogren's%20syndrome (last visited May 7, 2013).

[5] "Filamentary Keratitis is a type of keratitis which is usually superficial and most commonly related to dry eye syndrome. Filamentary Keratitis is typically a chronic (recurring) corneal condition. In cases of dry eye syndrome, the outer most layer of the corneal cells may die and form attached filaments to the cornea. This condition is known as Filamentary Keratitis. In more severe cases, deeper layers of the cornea are affected and scarring can occur during the healing process. This will affect vision if the central area of the cornea is involved." Filamentary Keratitis, http://www.artisanoptics.com/services/eye_diseases_conditions/filamentary_keratitis/ (last visited May 7, 2013).

[6] Complaint Exh. A.

Syndrome.  Rather, in response to the Insurance Policy Application's question whether Plaintiff had "ever been treated for or ever had any known indication of . . . disorder of eyes . . . ." Plaintiff checked the box labeled "No."  Insurance Policy Application at 5, Question 2.  Nevertheless, Defendant has not denied coverage based on Plaintiff's failure to disclose such condition, nor asserted such failure as an affirmative defense to this action or in opposition to this motion.

Plaintiff has continuously worked in the financial securities business since 1977 when Plaintiff received her Series 7 license and was a retail stockbroker with Advest, an investment brokerage firm.  Ligotti Dep. Tr.[7] at 27-28.  Beginning in 1982, Plaintiff worked as a manager supervising other stockbrokers for the local office of several other brokerage firms including Moseley Securities, Inc., Prescott, Ball and Turben, S.C. Parker & Co., Moors and Cabot, Inc., and Gold K Investment ("Gold K"), which was predominantly a retirement technology company (public sector benefit specialists) with a brokerage division.  *Id.* at 28-37.  Plaintiff describes herself as a successful financial brokerage office manager with such responsibilities as looking at "blotters,"[8] hiring and discharging employees, and running the office. *Id.* at 37-38.

Meanwhile, Plaintiff, on her own, became involved in a project developing the Financial Peer Index ("the Index") which Plaintiff describes as a benchmark composed of various information including debt, income, savings, investments, occupation, and

---

[7] References to "Ligotti Dep. Tr." are to the pages of Defendant's May 26, 2011 deposition of Plaintiff, portions of which are filed as Defendant's Exh. 1, and as Plaintiff's Reply Exh. 2.

[8] As used here, the term "blotters" refers to a book or computer program where a brokerage records all the trades to which it is a party on a trading day.  The recorded details include, *inter alia*, the number of shares purchased or sold at what price and time, and whether the trade settled as appropriate. Blotter, http://financial-dictionary.thefreedictionary.com/blotter (last visited May 7, 2013).

demographics, which is used to compare one's personal financial performance against others within a specific geographic region. Ligotti Dep. Tr. at 14-17. In 2006, Plaintiff applied for a trademark for the Index. *Id.* at 17. By letter dated December 31, 2007, Plaintiff was advised by the U.S. Patent and Trademark Office that her trademark application for the Index had been received and the Index was assigned the mark FPI, written in standard characters, but in no particular font, style, size, or color, and that Plaintiff could anticipate final registration of the mark within 13 to 18 months. Defendant's Exh. 10 (Doc. No. 72-10).

While Plaintiff was the local Gold K office, Gold K sold the brokerage division to Winslow, Evans & Crocker ("Winslow"), for whom Plaintiff then worked for a short period of time, until differences between Plaintiff and Winslow's president regarding business ethics caused Plaintiff to leave Winslow[9] and enter into a business arrangement with Cantella & Company ("Cantella"). Ligotti Dep. Tr. at 39-41. Plaintiff's business arrangement with Cantella, memorialized in a contract Plaintiff signed on May 13, 2005, Defendant's Exh. 6, (Doc. No. 72-6) ("Cantella Contract"), provided that for a period of five years from April 1, 2005 through March 31, 2010, Plaintiff would work out of her home as a consultant to Cantella, for which Plaintiff was to be paid $ 4,000 per month and would receive a share of brokerage commissions if her commissions on security trading for the month exceeded $ 4,000. Ligotti Dep. Tr. at 47-48, 50. Cantella's monthly base salary to Plaintiff was also intended as compensation for Plaintiff's travel to and from New York, where Plaintiff appeared on

---

[9] Plaintiff stated at her deposition that after she left Winslow, its president was incarcerated. Ligotti Dep. Tr. at 41.

CNN and CNBC television promoting the Index and, indirectly, also promoting Cantella. *Id.* at 50.

Plaintiff preferred her work arrangement pursuant to the Cantella Contract to her previous office management positions with various investment brokerage firms because her chronic dry eye condition was worsening and Plaintiff believed working out of an office in her home would provide her with the necessary flexibility she then needed to tend to her chronic dry eye condition, including intermittently administering eye drops, then lying down with cold compresses on her eyes, and closing herself up in a small bathroom for fifteen to twenty minutes with a "mister" which Plaintiff described as running the shower or using some other appliance that would produce a mist in the air to lubricate her eyes. Ligotti Dep. Tr. at 45-46, 48-49. Plaintiff maintains that her chronic eye condition was worsening and her eyes increasingly dry, and the deterioration was the reason she sought such a working arrangement as that provided pursuant to the Cantella Contract. *Id.* at 49.

Although Cantella was aware of Plaintiff's chronic dry eye condition prior to offering the Cantella Contract to Plaintiff, Cantella anticipated Plaintiff's promotion of the Index would indirectly bring name recognition to and benefit Cantella. Plaintiff maintains she never authorized Cantella or anyone else to use the Index, and that Cantella never used the Index in its business. Plaintiff's Dep. Tr. at 18. Plaintiff brought with her to Cantella 16 existing clients, and acquired one more prior to her alleged disability onset date. For the five years duration of the Cantella Contract,

Plaintiff's investment activity produced relatively low net commissions.[10]

On July 26, 2007, some debris entered Plaintiff's eyes ("the incident"), exacerbating her dry eye condition, and causing marked swelling, redness, pain and blurriness. The record is inconsistent as to whether the debris entered Plaintiff's eye when she attempted to open a stuck door to her attic, or is attributable to cosmetics that were applied to Plaintiff in preparation for an appearance on a local television show on July 26, 2007. In any event, Plaintiff sought treatment on an emergency basis from her ophthalmologists on July 27, 2007 when, because both Drs. Fichte and Endl were in surgery, Plaintiff she was examined by optometrist Michael S. Murphy, O.D. ("Dr. Murphy"), who prescribed antibiotics and steroids for the damage the debris inflicted on Plaintiff's eyes. Plaintiff had not previously been prescribed the same medications for her dry eye condition.

On August 7, 2007, Dr. Fichte examined Plaintiff, observing "the continuing affects [*sic*] caused by the debris that entered her eyes (swelling and redness)." April 4, 2010 Letter from Dr. Fichte in support of Plaintiff's claim (Complaint Exh. C) ("April 4, 2010 Letter"). Remarking as to Plaintiff's dry eye condition, Dr. Fichte commented that with the debris entering Plaintiff's eyes on July 26, 2007, "[w]hat was a precarious situation before now became an untenable one. She was advised that though steps would be taken to try and resolve this crisis there was no guarantee that these new

---

[10]   According to the Production Dashboard Summary showing the commissions generated by Plaintiff's investment activity while working pursuant to the Cantella Contract, Defendant's Exh. 9 (Doc. No. 72-9), Plaintiff generated new investment activity producing net commissions of $ 533 in 2005, $ 4,611 in 2006, and $ 0 for the first 10 months of 2007. Since July 26, 2007, Plaintiff's alleged disability onset date, Plaintiff generated new investment activity producing new commissions of $ 1,782 for the last two months of 2007, $ 2,753 for 2008, $ 3,030 for 2009, and $ 800 for the first three months of 2010, when Plaintiff's contract with Cantella expired.

symptoms and consequences would abate, though every effort would be made to reverse same." *Id.* Dr. Fichte also noted that following the incident, "what had been infrequent periodic visits became frequent in what was a losing attempt to reverse and minimize the aftermath caused by the incident." *Id.* Dr. Fichte decided Plaintiff should have a consultation with a "prominent specialist," Helen K. Wu, M.D. ("Dr. Wu") of Tufts University School of Medicine. *Id.* Upon examining Plaintiff on December 12, 2007, Dr. Wu concurred with Dr. Fichte's diagnosis.

After Plaintiff's consultative examination with Dr. Wu, Dr. Endl, at the request of Dr. Fichte, began treating Plaintiff on December 13, 2007. On January 8, 2008, Dr. Endl performed conjunctival resection on Plaintiff's left eye, which was not successful.

In a letter dated February 4, 2008, from Plaintiff's then attorney, Michael J. Stachowski, Esq. ("Stachowski"), to one Philip C. McMorrow ("McMorrow"), who served as Cantella's President and Chief Operating Officer and directly supervised Plaintiff while the Cantella Contract was in effect, Defendant's Exh. 2 (Doc. No. 74-2) ("Stachowski Letter"), with a "re" line of "Ligotti-Cantella Annuity Purchase," Stachowski writes to "confirm our understanding of how the annuity purchases shall be handled." Stachowski Letter at 1. The Stachowski Letter opening paragraph states, "It looks like Rosemary is finally going to be a 'star.' I thought that even your general counsel was impressed with the progress that this project has taken." *Id.*

On February 11, 2009, Dr. Endl performed conjunctival resection on both of Plaintiff's eyes which was unsuccessful. Despite significant medical intervention, Plaintiff's dry eye condition did not improve and, on June 3, 2009, Plaintiff was advised by Drs. Fichte and Endl that the trauma to her eyes was permanent and could be

neither alleviated nor lessened by further treatment. Plaintiff maintains she was also advised to avoid using her eyes for more than 20 minutes at a time, and to rest her eyes for two hours between use, rendering it impracticable that Plaintiff would be able to continue to perform the necessary functions of her profession as a financial consultant.

On August 20, 2009, Plaintiff submitted a claim, ("Claim")[11] seeking to receive disability benefits pursuant to the Insurance Policy issued by Provident. In the Claim, Plaintiff asserts her disability began on July 26, 2007, which is also the last date Plaintiff claims to have worked. Claim at 3. Plaintiff attributed her claimed disability to an injury that occurred at her home on July 26, 2007 when, while opening a stuck door to her attic, debris flew into her eye. Claim at 3. In contrast, Plaintiff's medical records from Fichte, Endl and Elmer Eye Care, Plaintiff's treating ophthalmologists, indicate that upon presenting to Dr. Murphy on July 27, 2007, Plaintiff complained of irritation to her left eye which she attributed to the "heavy makeup" she had to wear for a television appearance "on Monday."[12] Defendant's Exh. 35.

Despite the exacerbation of her Sjögren's Syndrome, Plaintiff continued to be paid her monthly salary under the Cantella Contract because, according to McMorrow, "the contract was written in such a way that [Plaintiff] was entitled to the money regardless of her inability to perform as we had hoped." McMorrow Affidavit ¶ 9. McMorrow further avers that "during this period Ms. Ligotti did appear on television on a

---

[11] A copy of Plaintiff's Claim is attached as Exhibit D to the Complaint.

[12] The court takes judicial notice July 27, 2007 was a Friday, such that the Monday immediately preceding July 27, 2007 was July 23, 2007. However, a schedule of television appearances prepared by Plaintiff indicates Plaintiff had a television appearance on July 26, 2007. Defendant's Exh. 33.

few occasions to further the 'Financial Peer Index' but any research that had to [be] done I handled for her and furnished the information to her since she was unable to do such research on her own." *Id.*

Despite her allegedly debilitating chronic eye condition, Plaintiff engaged in out-of-town travel promoting the Index and, indirectly, Cantella.  Plaintiff submitted to Cantella travel invoices for ten business trips taken between September 13, 2007, and January 6, 2009.  Defendant's Exhs. 11 through 19 (Docs. Nos. 72-11 through 72-19).  After the July 26, 2007 incident, Plaintiff also continued to participate in annual audits of her home office which was treated, for regulatory purposes, as a Cantella branch.  In connection with a "2007 Audit letter from Michael Kelsey," Plaintiff e-mailed McMorrow on November 3, 2007, reminding McMorrow that Plaintiff's use of the title "Senior Vice President - Investments" had been discussed with and approved by McMorrow, and advising that Plaintiff had held the same title at various brokerage firms for more than 25 years and that Plaintiff had no intention of relinquishing the title which, once established "is transferrable from firm to firm."  November 3, 2007 e-mail to McMorrow, Defendant's Exh. 21 (Doc. No. 72-21).  Plaintiff continued to deduct the same types of unreimbursed business expenses, including expenses for the telephone, postage, copying, computer/internet, office supplies, and automobile, from her income taxes for the years following her alleged disability onset date, as before the incident.  Plaintiff also continued to appear on television broadcasts promoting the Index, and to take continuing education classes required for Plaintiff to retain her professional licenses.

In Plaintiff's Individual Disability Claim Form ("Claim Form")[13] filed August 20,

2009, seeking payment for life of disability benefits under the Insurance Policy, Plaintiff

claimed she became totally disabled as of July 26, 2007, as a result of an

"injury/accident" when debris hit her eyes upon attempting to open the door to her attic

which was stuck.  Claim Form at 3. According to Plaintiff, prior to the incident, she was

able to engage in "extensive" reading of both printed material and computer screens, to

use the computer to read and write notes and manage client files, perform financial

research, travel, drive, use the telephone, and make presentations.  Claim Form at 4.

In contrast, after the incident, Plaintiff was able to engage in the same activities on only

a limited, intermittent, and sporadic basis, "if at all."  *Id.*  In support of her claim, Plaintiff

submitted the Attending Physician's Statement completed and signed on August 6,

2009 by Dr. Endl who listed a primary diagnosis of Keratitis Sicca, stating Plaintiff

"should strictly limit use of her eyes, and avoid reading and computer related activities.

Injury significantly changed and impaired eye condition.  I do not expect improvement

and condition may worsen."  Claim Form at 10-11.  In a telephone conversation with

Defendant's claim representative on September 28, 2009, Plaintiff characterized the

cause of her disability as an "accident/injury."  Unum Claim Determination ("Claim

Determination")[14] at 2.  Plaintiff also explained that she had been working at a "reduced

level since 2005 for reasons not related to disability (caring for her elderly mother and

godmother.'"  *Id.*

---

[13] Complaint Exh. D.

[14] Complaint Exh. B.

Plaintiff's Claim was reviewed by Defendant's on-site physicians ("OSP") who found Plaintiff's medical records lacking any indication that Plaintiff's physicians had restricted Plaintiff's work as claimed or that Plaintiff experienced any work limitations until 18 months after filing the Claim Form. Claim Determination at 2. Plaintiff's Claim was also reviewed by a second OSP who found no support for Plaintiff's assertion that her eye impairment was any worse than prior to July 26, 2007, that Plaintiff's medical records failed to establish Plaintiff actually complained of getting debris in her eyes, and that nothing should prevent Plaintiff from working in the same capacity as she did prior to July 26, 2007. *Id.* at 3.

Plaintiff's claim was initially denied on January 11, 2010 on the basis that Plaintiff's eye impairment did not restrict or limit Plaintiff so as to prevent Plaintiff from performing the duties of her occupation. Plaintiff appealed the claim denial and, on May 26, 2010, the denial was upheld by Defendant. Plaintiff then commenced this action.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). The court is required to construe the evidence in the light most favorable to the non-moving

party.  *Tenenbaum v. Williams*, 193 F.3d 58, 59 (2d Cir. 1999) (citing *Anderson,* 477

U.S. at 255); *Rattner*, 930 F.2d at 209.  The party moving for summary judgment bears

the burden of establishing the nonexistence of any genuine issue of material fact and if

there is any evidence in the record based upon any source from which a reasonable

inference in the non-moving party's favor may be drawn, a moving party cannot obtain a

summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48

("summary judgment will not lie if the dispute about a material fact is "genuine," that is,

if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party").  "A fact is material if it 'might affect the outcome of the suit under governing

law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477

U.S. at 248).

   "[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of

Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  "Where the plaintiff moves for summary

judgment, he bears a greater initial burden to show that the evidence supporting his

claims is so compelling that no reasonable jury could return a verdict in favor of the

defendant."  *Guillory v. Ellis*, 2012 WL 2755296, at * 5, n. 16 (N.D.N.Y. Mar. 22, 2012)

(citing *U.S. S.E.C. v. Meltzer*, 440 F.Supp.2d 179, 187 (E.D.N.Y. 2006)).  Once a party

moving for summary judgment has made a properly supported showing as to the

absence of any genuine issue as to all material facts, the nonmoving party must, to

defeat summary judgment, come forward with evidence that would be sufficient to

support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects

Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an

affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

In the instant case, Plaintiff moves for summary judgment on the basis that the undisputed evidence in the record establishes Plaintiff meets the Insurance Policy's definition of "totally disabled," Plaintiff's Memorandum at 2-9, and there is no medical evidence in the record from which a trier of fact could conclude otherwise. *Id.* at 9-23. In opposition to summary judgment, Defendant argues Plaintiff has failed to establish as a matter of law she is "totally disabled" under the Insurance Policy, Defendant's Response at 2-8; evidence in the record establishes Plaintiff continued to perform some of her occupational duties after the date she claims she became "totally disabled," *id.* at 9-16; Plaintiff's evidence fails to establish she is "totally disabled," *id.* at 16-18; and even if Plaintiff can establish, as a matter of law, total disability, she cannot establish meeting the requirements for lifetime disability benefits under the Insurance Policy, *id.* at 18-21. In further support of summary judgment, Plaintiff asserts the cases Defendant references in opposition to summary judgment actually support summary judgment in Plaintiff's favor, Plaintiff's Reply at 4-6; the occupational duties Defendant maintains Plaintiff continues to perform are merely "incidental" and not "material and substantial," *id.* at 6-8; and Plaintiff's medical evidence establishing Plaintiff is totally disabled is not refuted by Defendant, *id.* at 8-9.

## 2. "Totally Disabled" as Defined Under the Insurance Policy

The parties dispute whether Plaintiff meets the requirement for disability insurance payments based on "total disability" as defined under the Insurance Policy.

Plaintiff maintains that because of her severe chronic dry eye condition, she is unable to use her eyes for more than 20 minutes at a time before having to rest her eyes for two hours, which renders Plaintiff unable to read detailed documents and look at a computer screen or monitor for extended periods of time continuously throughout the day as a financial advisor position requires. Plaintiff's Memorandum at 4-5. Defendant, in opposition, does not dispute that a financial advisor position requires extensive use of one's eyes to view data on computer screens and read detailed reports, but asserts that Plaintiff's work record for several years preceding the onset of her claimed disability is consistent with Plaintiff only having worked for five to 15 hours per week, a reduced workload which is not inconsistent with Plaintiff's alleged diminished eyesight capacity, Defendant's Response at 7-9, and that Plaintiff continued to work at the same capacity following the incident despite her alleged disabling condition. *Id.* at 9-16. Defendant further contends that the restriction to Plaintiff's use of her eyes is self-imposed and not supported by Plaintiff's medical record. *Id.* at 16-18. Finally, Defendant argues that even if Plaintiff can establish she is "totally disabled" as defined under the Insurance Policy, Plaintiff cannot establish she is entitled to life-time disability insurance payments. *Id.* at 18-21. In further support of summary judgment, Plaintiff argues Defendant has misrepresented each of the cases on which Defendant relies in opposing summary judgment, Plaintiff's Reply at 4-6, that the facts to which Defendant points to show Plaintiff is still able to work establish only that Plaintiff is capable of performing "incidental" duties, rather than material and substantial duties, *id.* at 6-8, and that Defendant has failed to refute the opinions of Plaintiff's three physicians. *Id.* at 8-9.

In this diversity action, the substantive law of New York applies. *Shapiro v.*

*Berkshire Life Insurance Company*, 212 F.3d 121, 124 (2d Cir. 2000) (applying New York substantive law in diversity action for total disability benefits under disability insurance policy and citing *GNOC, Corp. v. Endico*, 876 F.2d 1076, 1078 (2d Cir. 1989)).  "Under New York law, 'insurance policies, like other contracts, are to be construed so as to give effect to the intent of the parties as expressed by their words and purposes.'"  *National Union Fire Ins. Co. v. Stroh Companies, Inc.*, 265 F.3d 97, 103 (2d Cir. 2001) (internal quotation marks and citation omitted).  "Unambiguous terms are to be given their plain and ordinary meaning, and ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract."  *Id.*  "Any ambiguities in an insurance policy are 'construed against the insurer, particularly when found in an exclusionary clause.'"  *Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar, BP v. Philadelphia Indemnity Insurance Company*, 462 Fed.Appx. 70, 72 (2d Cir. 2012) (quoting *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 457 N.E.2d 761, 764 (N.Y. 1983)).  Where, however, "the words are clear and unambiguous, they must be accorded their plain and ordinary meaning, and the policy enforced as written; a court is not free to modify such terms by judicial construction."  *Id.* (quoting *Francis v. INA Life Ins. Co.*, 809 F.2d 183, 185 (2d Cir. 1987)).  Further, "[i]nterpretation of an insurance policy is a legal question, unless ambiguous language in the policy can only be resolved by examination of contested extrinsic evidence, in which case it is a question of fact."  *Nat'l Union Fire Ins. Co.*, 265 F.3d at 103 (internal quotation marks and citation omitted).

"It is well-settled in New York that 'occupational disability policies are designed to indemnify against loss of capacity to work, not against loss of income.'"  *Shapiro*, 212

F.3d at 125 (quoting *Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F.Supp. 362, 368

(E.D.N.Y. 1997)).  As such, recovery will not be precluded "even if plaintiff were to earn

a larger income from his new occupation."  *Id.* (citing cases).

According to New York law, the insured bears the burden of proving she is totally

disabled within the meaning of the disability insurance policy.  *Shapiro*, 212 F.3d at 124

(citing *Goell v. United States Life Ins. Co.*, 55 N.Y.S.2d 732, 732-33 (1st Dep't 1945)).

As relevant to the instant case, the Insurance Policy specifically provides,

> Total Disability means that due to Injuries or Sickness:
> 1.     you are unable to perform the substantial and material duties of your
>        occupation; and
> 2.     you are under the care and attendance of a Physician.

Insurance Policy at 4, Definitions, Total Disability.

The term "total disability," as defined in the Insurance Policy at issue in this case,

"tracks the standard articulated by the New York courts: '[A] claimant is 'totally disabled'

when he or she is not longer able to perform the 'material' and 'substantial'

responsibilities of his or her job." *Id.* (citing *Klein v. National Life of Vermont*, 7

F.Supp.2d 223, 227 (E.D.N.Y. 1998) (further citation omitted)).[15]

"Occupation" is defined under the Insurance Policy as "the occupation (or

occupations, if more than one) in which you are regularly engaged at the time you

became disabled." *Id.* at 4, Definitions, Total Disability.  In making a disability

determination, the term "occupation" is interpreted pursuant to "a 'fact-oriented,

functional approach that look[s] to the professional activities in which the insured was

---

[15]  Total disability would be presumed if Plaintiff suffered "the entire and irrevocable loss of sight
of both eyes. . . ," Insurance Policy at 5, Benefits, Total Disability, which Plaintiff does not claim here.

regularly engaged at the time of the onset of the insured's disability.'" *Id.*

Although Plaintiff seeks disability insurance payments based only on total disability, the Insurance Policy also provides for payment of residual disability benefits if Plaintiff establishes she is " not able to do one of more of [her] substantial and material daily business duties or [is] not able to do [her] usual daily business duties for as much time as it would normally take [her] to do them." Insurance Polity at 7, Definitions, Residual Disability ("residual disability provision").[16] Because it is necessary to interpret the Insurance Policy so as to give effect both to the total disability provision, as well as the residual disability provision, the residual disability provision can only be given meaning if the total disability provision is construed as requiring Plaintiff be unable to perform any of the substantial and material duties of her occupation, such that an inability to perform some but not all of such substantial and material duties would render the Plaintiff only residually disabled. *See Simon v. Unum Group*, 2009 WL 857635, at * 5 (S.D.N.Y. Mar. 30, 2009) (finding disability insurance policy, containing residual disability and total disability provisions identical to those at issue in the instant case, unambiguous when construing total disability provision to require insured be unable to perform any of the substantial and material duties of his occupation). Nevertheless, the continued ability to perform duties that are merely incidental to an

---

[16] The Insurance Policy's residual disability provision specifically reqires payment of disability benefits based on residual disability meaning:

1.     you are not able to do one of more of your substantial and material daily business duties or your are not able to do your usual daily business duties for as much time as it would normally take you to do them;
2.     your Loss of Monthly Income is at least 25% of your Prior Monthly Income; and
3.     you are under the care and attendance of a Physician.

Insurance Polity at 7, Definitions, Residual Disability.

insured's occupation will not prevent a finding of total disability. *See Shapiro*, 212 F.3d at 124 (finding disabled dentist's office administration work "incidental to his material and substantial duties as a full time dentist"). Simply put, a finding of "total disability" requires an insured's disabling condition prevents performing work "of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties. . . ." *Klein*, 7 F.Supp.2d at 227.

Here, that Plaintiff suffers from a severe chronic dry eye disease, Sjögren's Syndrome, is undisputed. *See* Complaint ¶ 14 (describing Plaintiff's alleged disabling eye condition as "marked by debilitating swelling, pain and blurriness of vision and further causes and/or exacerbated sever conditions of sicca conjunctivitis,[17] severe keratitis,[18] and Sjogren's syndrome"); Plaintiff's Memorandum at 10 (arguing Plaintiff's "disability is permanent and is caused by a combination of an injury . . . exacerbating what had been her long standing condition of Sjogren's Syndrome, Filamentary Keratitis and Conjunctiva Chalasis); Defendant's Response at 19-20 (acknowledging Plaintiff's Sjögren's Syndrome diagnosis was confirmed by biopsy performed by eye specialist in Boston, Massachusetts, on February 1, 1984). Nevertheless, Plaintiff cannot establish she is entitled to summary judgment on her disability insurance claim because there are genuine issues of material fact concerning the extend of her disability and the status of

---

[17] "Keratoconjunctivitis sicca" or "sicca conjunctivitis" is a dry eye "condition associated with inadequate tear production and marked by redness of the conjunctiva, by itching and burning of the eye, and usually by filaments of desquamated epithelial cells adhering to the cornea . . . ." Medical Dictionary, http://www.merriam-webster.com/medlineplus/dry+eye (last visited May 7, 2013).

[18] "Keratitis" is defined as "inflammation of the cornea of the eye characterized by burning or smarting, blurring of vision, and sensitiveness to light and caused by infectious or noninfectious agents . . . ." Medical Dictionary, http://www.merriam-webster.com/medlineplus/keratitis (last visited May 7, 2013).

her employment when her disability arose as well as whether Plaintiff remains capable of performing such work.

### A. Ability to Perform Substantial and Material Duties of Occupation

The parties do not dispute that to establish total disability based on illness or injury, Plaintiff must demonstrate an inability "to perform the substantial and material duties of [her] occupation." Insurance Policy at 4, Definitions, Total Disability. Plaintiff claims that being able to use her eyes continuously throughout the day to read detailed documents and view computer screens for an extended period of time on an regular and ongoing basis is a "material and substantial duty" of her occupation as a financial advisor such that the her need to rest her eyes for two hours after only 20 minutes of use renders her totally disabled from her occupation. Plaintiff's Memorandum at 4-5. Defendants maintain evidence in the record begs the question whether Plaintiff is totally disabled as alleged because Plaintiff's alleged need to rest her eyes after 20 minutes of use was self-imposed by Plaintiff, Defendant's Response at 16-18, and Plaintiff's work record establishes Plaintiff had been working in a reduced capacity prior to July 26, 2007, the alleged disability onset date, after which further evidence in the record suggests Plaintiff continued to work at the same reduced capacity. Defendant's Response at 9-16. In further support of Summary Judgment, Plaintiff maintains Defendant has not offered any evidence from an expert as to Plaintiff's eyesight restrictions, Plaintiff's Reply at 8-9, and that Defendant ignores the fact that the duties Plaintiff remains able to perform are only incidental, rather than material and substantial to working as a financial advisor. *Id.* at 6-8.

With regard to Plaintiff's assertion that she can comfortably use her eyes for only 20 minutes, following which it was necessary for Plaintiff to rest her eyes for two hours, Defendant argues such restriction was never actually imposed by Dr. Endl based on his independent assessment of Plaintiff's condition but, rather, was merely a repetition of Plaintiff's description to Dr. Endl of her ability to use her eyes. Defendant's Response at 17 (citing Endl Dep. Tr.[19] at 80-81, 84). Specifically, when questioned as to when Plaintiff lost her ability to read for a prolonged period, Dr. Endl responded that Plaintiff reported that after 20 minutes of reading, "the words start to run together," and she "then needs to rest her eyes for a couple of hours in order to regain the ability to read reasonably." Endl Dep. Tr. at 80-81. Dr. Endl did not provide an exact onset date for Plaintiff's inability to engage in prolonged reading; rather, Dr. Endl stated Plaintiff first reported she was unable to read upon seeing "Dr. Murray."[20] *Id.* at 81. Dr. Endl further explained that when examining a patient with dry eyes, "[i]f they tell me after a while they can't read and I see significant dry eye I have to take their word for it. So I cannot prove yes or no on that." *Id.* at 84.

Dr. Endl's deposition testimony is in contrast to Dr. Fichte's statements in an April 4, 2010 letter Dr. Fichte wrote ("Dr. Fichte Letter")[21] in further support of Plaintiff's disability insurance benefits. In particular, Dr. Fichte attributes Plaintiff's eye use

---

[19] References to "Endl Dep. Tr." are to pages of Defendant's deposition of Dr. Endl, for which copies of relevant portions are submitted as Defendant's Exh. 5.

[20] There is no other mention of "Dr. Murray" in the record; it is possible that Dr. Endl actually referenced "Dr. Murphy" who treated Plaintiff on July 27, 2007, and that Dr. Murphy's name is incorrectly spelled in the transcript of Dr. Endl's deposition testimony.

[21] Plaintiff's Exh. 17.

restriction to Dr. Endl.  Dr. Fichte Letter at 1.  Dr. Fichte further reiterates Dr. Endl's

prior statement that Plaintiff "will never be able to perform duties of her occupations

other than on a sporadic and intermittent basis when eye condition allows."  *Id.* at 2.  Dr.

Endl, in his affidavit dated April 24, 2012 ("Dr. Endl Affidavit"),[22] avers "I stand by my

medical opinion that the restrictions and limitations of 20 minutes followed by 2 hours of

rest have been in effect since July 27, 2007 until the present."  Dr. Endl Affidavit ¶ 17.

Insofar as Dr. Endl's deposition testimony that his opinion that Plaintiff's use of her eyes

was restricted was based on Plaintiff's own reported ability to use her eyes, such

testimony is inconsistent both with Dr. Fichte's Letter attributing the restriction to Dr.

Endl, and Dr. Endl's averment that the restrictions on Plaintiff's use of her eyes were

consistent with his medical opinion.  Significantly, it is this very strict limitation to

Plaintiff's use of her eyes to which Plaintiff attributes her claimed inability to work as a

financial advisor.

    Simply put, there is a genuine issue of material fact as to whether Plaintiff,

despite suffering from a severe chronic eye condition, was required after using her eyes

for 20 minutes, to rest her eyes for two hours and, furthermore, even if Plaintiff was so

restricted by her eye condition, whether such restrictions prevented Plaintiff from

engaging in her usual occupation as defined under the Insurance Policy as "the

occupation (or occupations, if more than one) in which you are regularly engaged at the

time you became disabled."  Insurance Policy at 4, Definitions, Total Disability.

    Defendant also argues that Plaintiff's work-load as of July 26, 2007, based on

---

[22] Plaintiff's Exh. 20.

the relatively small number of clients (initially 16 before adding another client), and the commissions Plaintiff earned, is consistent with Plaintiff working only five to 15 hours per week, a level of work which Plaintiff should be able to maintain even if restricted to using her eyes for only 20 minutes at a time, followed by resting her eyes for two hours. Defendant's Response at 9-18.  Plaintiff argues the number of clients she carried as of July 26, 2007, is irrelevant to determining her "usual occupation" which is not dependent on the number of hours Plaintiff was working when she became disabled. Plaintiff's Reply at 4-6.  Inconsistencies in the record establish the existence of issues of material fact as to whether Plaintiff was, after the incident, unable to perform the substantial and material duties of Plaintiff's occupation in which she was engaged as of July 26, 2007.

Although Plaintiff asserts that after the incident, she had to abandon marketing the Index, the record indicates that Plaintiff continued to travel and make television appearances in furtherance of the project.  In particular, Plaintiff continued, well after her alleged disability onset date, to travel and incur business expenses in connection with the Index. That Plaintiff engaged in out-of-town travel promoting the Index and, indirectly, Cantella is supported by travel invoices Plaintiff submitted to Cantella for ten business trips taken between September 13, 2007 and January 6, 2009.  Defendant's Exhs. 11 through 19 (Docs. Nos. 72-11 through 72-19).  McMorrow explains that such business trips "were geared to [Plaintiff] trying to offload the 'Financial Peer Index' to others who would be capable of completing and furthering it since Ms. Ligotti was no longer able to carry the burden herself."  McMorrow Affidavit ¶ 8.  The invoices for such trips, however, establish that all ten trips occurred prior to June 2009, when Plaintiff was

advised by her physicians that further treatment was not expected to improve her chronic dry eye condition, and August 2009, when Plaintiff advised McMorrow that attempts by her physicians to improve her chronic eye condition had been exhausted. Complaint ¶ 15 and Exh. C.  The timing of these trips prior to the date Plaintiff was advised by her physicians that her dry eye condition was not expected to improve and, presumably, lost hope of benefitting from further treatment, is inconsistent with McMorrow's assertion that "[t]hese trips were geared to [Plaintiff] trying to offload the 'Financial Peer Index' to others who would be capable of completing and furthering it since Ms. Ligotti was no longer able to carry the burden herself."  *Id.* (underlining added).  Accordingly, McMorrow's assessment of the purpose of Plaintiff's business travel is inconsistent with McMorrow's own statement regarding when it became apparent that Plaintiff would be unable to continue marketing the Index.  Moreover, two of the business trips regarding the Index occurred prior to December 31, 2007, when Plaintiff's application for a trademark for the Index was accepted, thus raising the question why, if the July 26, 2007 incident so greatly exacerbated Plaintiff's dry eye as to cause Plaintiff to abandon efforts to market the Index, Ligotti Dep. Tr. at 18, Plaintiff took business trips to market the Index for which Plaintiff had yet to receive confirmation had been assigned a trademark.  A reasonable juror could, based on such actions, infer that Plaintiff's supposed disabling eye condition did not pose an obstacle to her determination to aggressively promote the Index for her economic benefit thus negating Plaintiff's claim that she was disabled as a result of the July 26, 2007 incident.

Another genuine issue of material fact precluding summary judgment is Plaintiff's actual occupation as of July 26, 2007, as raised by the statement in the February 4,

2008 Stachowski Letter to McMorrow, referencing a meeting between Plaintiff, McMorrow and Stachowski on January 11, 2008, that Plaintiff "is finally going to be a 'star.'" Stachowski Letter at 1. Stachowski's additional statements regarding a "mechanism" for the transfer of certain annuities, and the compensation to Plaintiff in connection with such annuity funds transfers raise further questions as to Plaintiff's ability to perform the substantial and material duties of her occupation as of that date. Plaintiff maintains such statements refer to the fact that Plaintiff was attempting to arrange for the "transition" of investment funds of Plaintiff's older clients "into fixed stream investments particularly since Plaintiff would not be available to assist them once in retirement due to disability," Plaintiff's Reply at 7; *see also* McMorrow Affidavit ¶ 12 ("It has also been relayed to me that Ms. Ligotti was attempting to arrange meetings with annuity companies for the purpose of furthering her business when in fact the truth is I was helping her meet with annuity companies in the hopes we could move her elder clients to these more secure type of investment vehicles particularly in light of the fact that Ms. Ligotti would no longer be able to carry out the duties of their investment advisor because of her disability"). That such meeting occurred in January 2008, more than one year before being advised by Dr. Endl in June 2009 that further treatment was not expected to be of any benefit, and filing her Claim Form in August 2009, based on that opinion raises the question whether Plaintiff was seeking to wrap up business with her clients because Plaintiff intended to retire from financial advisory work at that time irrespective of her eye condition, or because Plaintiff's worsening chronic dry eye syndrome rendered her unable to continue to serve her clients.

After the July 26, 2007 incident, Plaintiff also continued to participate in annual

audits of her home office which was treated, for regulatory purposes, as a Cantella branch. Assuming, *arguendo*, Plaintiff's participation in such audits was merely perfunctory, as Plaintiff asserts, Plaintiff's Reply at 7; McMorrow Affidavit ¶ 10, such fact does not explain why, in connection with a "2007 Audit letter from Michael Kelsey," Plaintiff e-mailed McMorrow on November 3, 2007, reminding McMorrow that Plaintiff's use of the title "Senior Vice President - Investments" had been discussed with and approved by McMorrow, and advising that Plaintiff had held the same title at various brokerage firms for more than 25 years and that Plaintiff had no intention of relinquishing the title which, once established "is transferrable from firm to firm." November 3, 2007 e-mail to McMorrow, Defendant's Exh. 21 (Doc. No. 72-21). Plaintiff's continued deduction of the same types of unreimbursed business expenses, including expenses for the telephone, postage, copying, computer/internet, office supplies, and automobile, from her income taxes for the years following her alleged disability onset date, as before, and to take continued education classes as required for Plaintiff to retain her professional licenses also raises a question as to Plaintiff's ability to continue to perform the substantial and material duties of her occupation after she allegedly became disabled.

Based on this record, genuine issues of material fact as to whether Plaintiff's chronic eye condition rendered Plaintiff unable to perform the substantial and material duties of the occupation in which she was regularly engaged as of July 26, 2007, preclude summary judgment.

### C. Plaintiff's Occupation

Although not specifically argued as such, Defendant's papers in opposition to summary judgment imply an issue of fact as to what Plaintiff's occupation was as of July 26, 2007, her alleged disability onset date. In particular, although Plaintiff listed her occupation on the Claim Form as "financial advisor," Plaintiff's contention that Defendant is required to accept that her usual occupation as of July 26, 2007 was that of financial advisor is erroneous because Plaintiff's occupation is defined under the Insurance Policy a "the occupation (or occupations, if more than one) in which you are regularly engaged at the time you became disabled." *Id.* at 4, Definitions, Total Disability. "Occupation" is further interpreted pursuant to "a 'fact-oriented, functional approach that look[s] to the professional activities in which the insured was regularly engaged at the time of the onset of the insured's disability.'" *Id.* In the instant case, there exist significant inconsistencies in the record as to what "professional activities" Plaintiff was regularly engaged in as of July 26, 2007.

Plaintiff's work record establishes she has worked for her entire career in the financial investments industry, including as a retail stockbroker and as a brokerage office manager, prior to her alleged disability onset date of July 26, 2007, yet the record also establishes that Plaintiff was working as a financial advisor on a limited basis, with Plaintiff working out of her home as a consultant pursuant to a contract with Cantrella, managing only 16 client accounts, marketing the Index, and indirectly promoting Cantella. Although Plaintiff, in a telephone conversation with Defendant's claim representative, advised that she had voluntarily reduced her workload in 2005 to take

care of her elderly mother and Godmother, Claim Determination at 2,[23] reasons unrelated to her chronic dry eye condition, Plaintiff testified at her deposition that the contracting position with Catrella appealed to her in 2005 because her chronic dry eye condition was worsening and it was much easier for Plaintiff to work out of her home where she had more freedom to take the necessary breaks to administer eye drops and make use of a mister to lubricate her eyes. Ligotti Dep. Tr. at 45-46, 48-49.

Of significance is the position of McMorrow that Plaintiff was not hired solely to work as a financial advisor. In particular, McMorrow explains that although he was aware when the Cantella Contract was offered to Plaintiff of Plaintiff's chronic dry eye condition, including that Plaintiff had been diagnosed with Sjögren's Syndrome and that her eyes were getting progressively worse, the base salary of $ 4,000 paid to Plaintiff under the Cantella Contract was not dependent on any Plaintiff's generating any particular level of investment activity but, rather, Plaintiff was offered the contract in anticipation that Plaintiff, in the course of developing and nationally marketing her Index, would bring recognition in the investment brokerage industry to Cantella. McMorrow Affidavit[24] ¶¶ 1-4.

Even the statements made by McMorrow regarding Cantella's expectations of Plaintiff's work under the Cantella Contract are inconsistent. In particular, McMorrow first avers that "the [Cantella] contract was in place in the hopes that Ms. Ligotti because of her national reputation as a financial advisor would develop her concept

---

[23] Plaintiff has not challenged the veracity of this determination.

[24] Defendant's Exh. 4 (Doc. No. 79-4).

known as the "Financial Peer Index" and in the process would bring the Cantella and Company name to a higher recognition level within the investment brokerage industry," McMorrow Affidavit ¶ 3, implying Cantella was motivated to offer Plaintiff the Cantella Contract so as to indirectly benefit from Plaintiff's appearances on national television programs to discuss the Index,  In contrast, several paragraphs later, McMorrow avers that "[o]n or about August 2009, I was advised by Mrs. Ligotti that all attempts by her doctors to improve her situation had not resulted in her obtaining sufficient relief to be able to once again perform the duties of financial advisor as she had in the past," *id.* ¶ 13, implying Plaintiff held a financial advisor position with Cantella.  McMorrow's statements regarding Plaintiff's work for Cantella thus are ambiguous as to what work Plaintiff was expected to perform under the Cantella Contract, rendering it impossible to determine whether Plaintiff's alleged disability rendered her unable to perform the occupation – either as a financial advisor or promoting the Index and Cantella –  in which she was "regularly engaged" when she became disabled.

Accordingly, there are genuine issues of material fact regarding Plaintiff's occupation as of July 26, 2007, and which preclude summary judgment such that Plaintiff' motion should be DENIED.


**D.       Cause of Disability**

Lastly, the parties disagree as to whether, even if Plaintiff can establish as a matter of law she is totally disabled based on her chronic eye condition, Plaintiff can establish she meets the requirements for lifetime disability benefits under the Insurance Policy.  According to Plaintiff, she has consistently attributed her total disability to the

July 26, 2007 incident which Plaintiff describes as an "injury caused by debris entering her eyes." Complaint ¶ 12; Plaintiff's Memorandum at 5 ("the claim for total disability is based on the fact that the injury has caused exacerbation of Ms. Ligotti's long standing underlying illness so that the combination of the injury and illness has caused her to be 'totally disabled.'"). Plaintiff maintains that because the Insurance Policy is silent as to what anniversary date applies to a disability caused by a combination of illness and injury, and any ambiguity must be resolved in favor of the insured, Plaintiff's claimed total disability based on the July 26, 2007 injury that aggravated her underlying dry eye condition must be construed as total disability caused by injury, rather than by illness. *Id.* at 5-6.

Defendant maintains that even if Plaintiff can establish as a matter of law that she is totally disabled based on her chronic eye condition, she cannot establish that she meet the requirements for lifetime disability benefits because Plaintiff is unable to establish that she was disabled by illness prior to age 60 or by accidental injury prior to age 65. Defendant's Response at 18-19. As such, even if Plaintiff can establish total disability, she would be limited to receiving disability payments for 24 months. *Id.*

The Insurance Policy provides for the monthly payment of disability benefits where total disability is attributed to an injury, for life if the disability commences prior to age 65, and for 24 months if the injury commences after age 65. Insurance Policy at 3, Policy schedule, Maximum Benefit Periods While Totally Disabled. Where total disability is attributed to an illness, monthly disability benefits are to be paid for life if the disability commenced prior to age 60, until age 65 or for at least 24 months if the disability commenced between ages 60 and 65, and for 24 months if the disability

commenced after age 65.  *Id.*  The insured's "age" is defined as "the ending date of the policy term in which you attained that age." *Id.* at 4, Definitions.  Because the initial effective date of Plaintiff's Insurance Policy was December 27, 1984, December 27 is the Insurance Policy's anniversary date such that the policy term ends on December 27 of each successive year.[25]  To be entitled to receive disability payments for life based on total disability, Plaintiff, whose date of birth is January 23, 1948, is required to establish total disability based on injury by December 27, 2013, *i.e.*, the ending date of the Insurance Policy's term for the year in which Plaintiff attains age 65, or based on illness by December 27, 2008, *i.e.*, the ending date of the Insurance Policy's term for the year in which Plaintiff attains age 60.

Here, the record is unclear as to whether Plaintiff's alleged disabling chronic eye condition is attributed to Sjögren's Syndrome or to the July 26, 2007 incident.  Although Plaintiff maintains she suffered an injury on July 26, 2007 when dust entered her eye, exacerbating her Sjögren's Syndrome to the point where Plaintiff has, since then, been unable to use her eyes for more than 20 minutes at a time, after which she was required to rest her eyes for two hours, the record is inconsistent as to what happened on July 26, 2007.  Specifically, there is a dispute between Plaintiff's claim that on July 26, 2007, debris entered her eyes when she opened a stuck attic door at her home, and Plaintiff's report to Dr. Murphy on July 27, 2007, that she "had to wear make up on Monday for a broadcast & since then has been very irritated."  July 27, 2007 Patient Eye Examination Summary (Defendant's Exh. 35), and Schedule of Plaintiff's

---

[25] Defendant has not asserted that Plaintiff failed to pay any scheduled insurance premium or that the Insurance Policy ever lapsed for non-payment of premiums.

Television Appearances (Defendant's Exh. 33 (showing Plaintiff scheduled to appear July 26, 2007, on local television station to discuss a drop in Dow Jones Industrial Average).  Whether Plaintiff's total disability is attributed solely to Sjögren's Syndrome, or to an injury is relevant to the age by which Plaintiff must establish total disability to determine the length of time to which Plaintiff is entitled to collect monthly disability insurance payments.

Significantly, if Plaintiff's total disability is attributed solely to illness, specifically, Sjögren's Syndrome, the diagnosis which was first made on February 1, 1984, Facts, *supra*, at 4, well before December 27, 2008 when Plaintiff, according to the relevant terms of the Insurance Policy, attained the age of 60, because she did not become disabled by Sjögren's Syndrome until after age 60 Plaintiff would, under the terms of the Insurance Policy, be entitled to received disability insurance benefits for only 24 months.  *See* Insurance Policy at 3, Policy schedule, Maximum Benefit Periods While Totally Disabled (limiting monthly disability benefits to 24 months where disability based on illness commenced between ages 60 and 65).  Similarly, if Plaintiff's total disability is attributed to an injury, here, the July 26, 2007 incident, then Plaintiff is entitled to lifetime disability insurance benefits only if she can establish she was fully disabled by such injury prior to December 27, 2013, when she attained the age of 65 as determined under the Insurance Policy. *Id.* (providing for monthly disability benefits where total disability based on injury commences prior to age 65 and for 24 months if total disability commences after age 65).  As such, the question whether Plaintiff's chronic eye condition is properly attributed to her illness or to an accident is a material issue of fact precluding summary judgment for Plaintiff.

**CONCLUSION**

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 70),

should be DENIED.


Respectfully submitted,


/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:     May <u>7</u>, 2013
             Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 7, 2013
            Buffalo, New York